UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF RONALD JOHNSON,
BRENDA WEST (individually and as the
personal representative of Johnson's estate),
and SCOTT JOHNSON

        Plaintiff,

v.                                               Case No. 07-C-0754

NICHOLAS B. ROBINSON, LORI ADAMS,
and JENNIFER MENNE,

        Defendants.

---

**DECISION AND ORDER DENYING
MOTION FOR SUMMARY JUDGMENT**

---

On June 10, 2006, Ronald Johnson, an inmate at Oshkosh Correctional Institution ("OSCI"), committed suicide by hanging himself with a sheet in the unit laundry room. His estate and siblings brought this civil rights action under 42 U.S.C. § 1983 against Psychologist Lori Adams, Correctional Officer Nicholas B. Robinson, and Sergeant Jennifer Menne, alleging that Johnson's suicide resulted from their deliberate indifference to his serious medical or psychiatric needs in violation of the Eighth Amendment. Federal jurisdiction over the civil rights claim arises under 28 U.S.C. §§ 1331 and 1334. The complaint also asserts a state law claim for negligence over which the court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

Each of the defendants has moved for summary judgment on the federal claim on the ground that the plaintiffs cannot meet their burden of proof on the issue of whether they were deliberately indifferent to Johnson's medical of psychiatric needs. For the reasons set forth below, I conclude that plaintiffs' evidence is sufficient to raise a jury question and therefore deny the defendants' motions. I begin with a statement of the facts viewed in the light most favorable to the plaintiffs.

**STATEMENT OF FACTS**

Johnson was an inmate at OSCI until his death by suicide on June 10, 2006. (PPFOF ¶ 9; DPFOF ¶¶ 2, 13.) Prior to his suicide, Johnson had attempted suicide on two previous occasions. In July of 2000, prior to his arrival at OSCI, he had attempted to hang himself. (PPFOF ¶¶ 36, Aff. of Paul A. Kinne, Ex. A.) Following problems with his medication, Johnson again attempted suicide in May 2004 by cutting his arm and wrist with a razor blade. Regarding the latter incident, defendants Menne and Adams were aware that Johnson had made statements about harming himself as early as February 2004 prior to his actual attempt in May. (PPFOF ¶¶ 39, 42, 43, 44.) Adams had met with Johnson when he was in clinical observation after the May 2004 incident and noted he had cut himself. She referenced the suicide attempt in a November 2005 note and in February 2006 observed that he suffered from severe psychiatric difficulties. (PPFOF ¶¶ 43, 44, 45.)

In early June 2006, Inmate James Maloney, Johnson's cellmate, became concerned about Johnson's behavior. (PPFOF ¶ 46.) Johnson was not sleeping much and was constantly pacing in his room. (Maloney Dep. at 21.) Although Johnson had made statements in Maloney's presence such as "I'm never going to make it out of here alive", he never expressly stated to Maloney that he intended to kill himself. (DPFOF ¶ 24, Maloney dep. at 120.) Maloney spoke with Sgt. Menne

2

about his concerns for Johnson on at least four separate occasions in the days leading up to his suicide. Approximately a week before Johnson committed suicide, Maloney told Sgt. Menne that Johnson was acting strangely and he thought it was related to Johnson's sleep medication. Maloney suggested Johnson be seen by a psychiatrist or psychologist. (*Id.* at 22-23.)

On a subsequent occasion, Maloney told Sgt. Menne that Johnson seemed to be getting worse, that he appeared extremely depressed, wasn't eating, and seemed to be spending more time by himself in the laundry room. *(Id.* at 24.) On about June 9, the day before Johnson's suicide, Maloney told Sgt. Menne that Johnson should be placed in "obs," meaning clinical observation. (PPFOF ¶ 60; DPFOF ¶ 21.) Although Maloney does not recall using the word suicidal to describe Johnson's condition, that is what he intended to convey by telling Sgt. Menne that he belonged in observation. As Maloney explained: "When you mention obs, that's all incorporated with – you put him in obs for a reason, suicidal." (Dep. of James Maloney at 121.) According to Maloney, Corrections Officer Robinson was present for some of the conversations between Maloney and Sgt. Menne and acknowledged that Johnson was acting odd. (DPFOF ¶ 23.) Robinson was also aware of Johnson's previous effort to harm himself. (PPFOF ¶ 58.) Neither Sgt. Menne, nor Officer Robinson, reported Maloney's concerns to a supervisor or the Psychological Services Unit (PSU).

On Friday, June 9, 2006, Johnson asked to meet with Adams, his psychologist. (DPFOF ¶¶ 3, 9; PPFOF ¶ 73.) Adams noted that Johnson was alert, cooperative and oriented. (DPFOF ¶ 11.) He demonstrated a restricted range of affect, with indeterminate mood and normal speech. Associations were well-ordered, no hallucinations were reported, and there was no evidence of delusional beliefs. (Kinne Aff., Ex. G.) Johnson told Adams he needed to see the psychiatrist in order to have his medication re-evaluated. Adams asked Johnson if he had submitted his request

3

through Health Services, but his response was evasive. Adams stated she was leaving for the day but made an appointment to see him the following Monday. When Johnson seemed unsatisfied, Adams told him that he would not be seen by the psychiatrist any earlier if the referral was written that day or Monday, and again informed him that she had scheduled an appointment for Monday, June 12. Johnson attempted to continue the discussion, but Adams interrupted him and said she had to leave the unit and would see him on Monday. Johnson appeared frustrated, and Adams then asked him if it was an emergency, stating that if it was she could contact another clinician from the PSU. Johnson replied "no obs" and walked away. (*Id.*)

On the evening of June 9, 2006, Robinson spoke with Johnson about his job in the unit laundry room and found him to be acting normally. (DPFOF ¶ 7.) The following morning, on June 10, 2006, Maloney also saw Johnson and believed him to be cheery, sociable, and "back to normal." (DPFOF ¶ 29.) Robinson again spoke with Johnson at approximately 3:30 p.m. on June 10 and found him to be acting normally. (DPFOF ¶ 8.) Approximately one hour later, after he failed to appear for a head count, Johnson was discovered in the laundry room where he had hung himself. (PPFOF ¶¶ 92, 93.)

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id*. at 323. Once this

4

burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id*. at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id*. at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir.1997). Additionally, the nonmoving party "cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989).

A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. Therefore, summary judgment is appropriate against a party who, after adequate time for discovery and in the face of a properly supported summary judgment motion, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id*. at 322.

5

# DISCUSSION

## I. INMATE SUICIDE AND DELIBERATE INDIFFERENCE

### A. Relevant Law

Plaintiffs' federal claim arises under the Eighth Amendment. To prevail on a claim that a prison official violated an inmate's Eighth Amendment rights by his failure to prevent injury or harm, a plaintiff must prove that (1) the inmate was facing a risk of harm that was objectively serious; and (2) that the official was deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). In *Farmer*, a transsexual inmate claimed the prison officials were deliberately indifferent to the risk of assault the inmate faced from male inmates in the general population of a federal prison. But it is not only from the threat of injury by other inmates that prison officials must protect inmates in their custody. By now, it is well established that prison officials can be held liable for losses resulting from the injury or death of an inmate even when the injury or death is at the hand of the very inmate they are required to protect.

The risk of suicide is far more difficult to guard against than the risk posed by another inmate. The more vulnerable inmate can always be separated from an inmate who poses a significant threat to his safety. But, of course, a suicidal inmate cannot be separated from himself. To protect the suicidal inmate from himself, prison officials attempt to remove from the inmate's possession any object that he could use to harm himself. Since, as this case demonstrates, even clothing or bedding can be used to kill oneself, the task of protecting an inmate from himself is not a simple one. To guard against the risk, prison officials usually place inmates known to be suicidal in observation cells where their activity is directly monitored twenty-four hours a day. While this

may tax prison resources, the more immediate difficulty is often in recognizing those inmates intent on killing themselves.

Indeed, in prison suicide cases, the question of what the defendant prison officials knew is usually key since the objective element of the test is always met. "In prison suicide cases, the objective element is met by virtue of the suicide itself, as '[i]t goes without saying that 'suicide is a serious harm.'" *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir.2001)). The focus thus shifts to "the subjective prong of the inquiry: deliberate indifference." *Estate of Brown v. Meierdirk*, 2008 WL 4630593 (W.D. Wis. July 11, 2008) (unpublished opinion).

Deliberate indifference is a high standard in any case—including an inmate suicide case. It requires more than merely demonstrating negligence or gross negligence by the jail or prison officials. *See Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987) ("Negligence, gross negligence, or 'recklessness' as the term is used in tort cases is not enough" to establish an Eighth Amendment violation.) To find deliberate indifference, a court must find "that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists *and he also must draw the inference*." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added). In other words, to prevail on their claim, plaintiffs must prove (1) the defendants had actual knowledge that Johnson was at substantial risk of suicide; and (2) the defendants disregarded the risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 847.

7

In deciding defendants' motion for summary judgment, of course, the question is not whether plaintiffs have proven these elements at this stage of the proceeding, but whether they have demonstrated the existence of evidence from which a reasonable jury could find in their favor. *Estate of Hill v. Richards*, 525 F. Supp.2d 1076, 1084 (W.D. Wis.2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Here, it is undisputed that the defendants failed to take any action to prevent Johnson from taking his own life. In fact, Sgt. Menne denies that Maloney ever talked to her about Johnson's health or strange behavior. Regardless of whether Maloney's version of events is true, however, the defendants contend that plaintiffs cannot establish that they were deliberately indifferent to Johnson's condition because they did not know that Johnson would harm himself. Plaintiffs' case fails, they contend, because they cannot show that the defendants had the requisite knowledge that Johnson posed a substantial risk of suicide.

Whether the defendants had such knowledge is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. The fact that the defendants deny that they had such knowledge is, of course, not conclusive on the issue. Otherwise, prison officials would be able to defeat such claims on summary judgment simply by denying they had such knowledge. Still, to survive summary judgment, a plaintiff must show the existence of evidence from which a factfinder could reasonably infer actual knowledge of the danger the prison official is alleged to have ignored. In *Estate of Novack ex rel. Turbin v. Wood County*, the Seventh Circuit observed "[m]ere knowledge that an inmate is behaving violently or 'acting in a "freaky" manner' is not sufficient to impute awareness of a substantial risk of suicide." 226 F.3d 525, 529 (7th Cir. 2000). "In order to be liable under the Eighth Amendment," the Court stated in *Novack*, "a prison official must be cognizant of the significant likelihood that an inmate

8

may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act."

With these principles in mind, I now turn to the specific claims here at issue.

### B. Deliberate Indifference Claims Against Robinson and Menne

Plaintiffs argue that "[g]iven the information at their disposal, Menne and Robinson should have concluded that Johnson was a substantial risk of committing suicide or, at least, they should have known they needed more information," (Doc. 29, Pl.'s Br. at 18). The information at their disposal, plaintiffs contend, consisted of the fact that Johnson had a history of suicide attempts, had spoken to Menne about suicidal thoughts in February, 2004, and Inmate Maloney's concern that Johnson was bad and getting worse. (*Id.*) In addition, Robinson is alleged to have also witnessed Johnson's increasingly strange behavior. (PPFOF ¶¶ 56, 57.) Plaintiffs also note that Menne and Robinson knew that when an inmate expresses concern about a fellow inmate's well-being, prison rules require them to act upon that information. From this, plaintiffs argue, "a jury could conclude that [Menne and Robinson] were deliberately indifferent to a looming substantial harm to Johnson." (*Id.*)

Although the question appears close, I conclude that plaintiffs have presented sufficient evidence to raise a jury question as to whether Menne and Robinson were deliberately indifferent to Johnson's well-being. Maloney's account, if believed by the jury, would support the finding that in the days leading up to his suicide, Johnson's condition was worsening, so much so that by June 9, the day before he killed himself, Maloney recommended that Johnson be placed in observation status. While Maloney may not have specifically used the word suicidal in describing Johnson's condition, his recommendation that Johnson be placed in observation clearly conveyed his own

9

opinion that Johnson was in fact a threat to his own safety. It is at least arguable that this information, combined with their training and the knowledge that Johnson had previously attempted to harm himself, would have alerted Menne and Robinson to the need to refer Johnson for an assessment. Instead, they did nothing and Johnson took his own life. Under these circumstances, a jury should decide whether the conduct of Menne and Robinson constitutes deliberate indifference.

### C. Deliberate Indifference Claim Against Adams

As to Adams, plaintiffs argue that her encounter with Johnson on June 9, combined with her knowledge of Johnson's history of mental illness and suicide attempts, are sufficient to support a jury finding that Adams, too, was aware that Johnson presented a substantial risk of suicide. Adams knew that Johnson's last suicide attempt in May of 2004 was related to his being upset over his medication. ((PPFOF ¶ 40.) When he asked to see her at the end of the day on June 9, it was about changing his medication. From his behavior, Adams recognized that he was frustrated with her refusal to address his problem at that time, and she even asked if it was an emergency. Rather than respond, Johnson simply said "no ops" and walked away.

Plaintiffs contend that the fact that Johnson did not directly answer Adams' question was a red flag that would have alerted a psychologist who was not indifferent to a need to investigate further. In fact, the response Johnson did give would have told Adams that Johnson knew that if she did have someone else speak to him, he would be placed on observation status. Since observation status is reserved for inmates who are suicidal, plaintiffs argue that Johnson, in effect, admitted that he was feeling suicidal. Under these circumstances, plaintiffs contend that a jury

10

could find that Adams knew that Johnson presented a substantial risk of harming himself and that her failure to take any action constitutes deliberate indifference.

Here, again, although the question is close, I conclude that the plaintiffs have presented sufficient evidence to present a jury question. Like Menne and Robinson, Adams seeks summary judgment on the ground that she lacked the knowledge required to support a claim of deliberate indifference. Essentially, Adams denies she had the requisite state of mind for a claim of deliberate indifference. She does not dispute for purposes of the present motion that when she saw Johnson on June 9, 2006, he presented a substantial risk of harming himself. It would be difficult to do so since he took his own life only twenty-four hours later. Nor does she claim that her response would have been appropriate had she recognized the risk of suicide he posed. Instead, she claims that she did not appreciate the risk he posed and thus lacked the state of mind needed for her failure to act to be found to constitute deliberate indifference.

The appellate courts have cautioned that district courts must be especially cautious in granting summary judgment when questions of a defendant's mental state are at issue. *Wakefield v. Northern Telecom, Inc.*, 813 F.2d 535, 540 (2d Cir.1987) ("Summary judgment is usually inappropriate when the moving party's state of mind is in issue."); *Central Nat. Life Ins. Co. v. Fidelity and Deposit Co. of Maryland,* 626 F.2d 537, 540 (7th Cir. 1980) ("Where intent is a controlling element, courts must be especially cautious in granting summary judgment, since the resolution of that issue depends so much on the credibility of the witnesses, which can best be judged by the trier of facts after observation of the witnesses during direct and cross-examination."); *Charbonnages de France v. Smith*, 597 F.2d 406, 416 (4th Cir.1979) (noting "summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of claim

11

or defense"). Perhaps in an overabundance of caution, I conclude that summary judgment should not be granted as to plaintiffs' claim of deliberate indifference against Adams.

It appears that Johnson contacted Adams because his medication was not helping him manage his anxiety. Rather than address the anxiety he reported, Adams asked Johnson if he had made a request through health services to see his psychiatrist about the problem with his medication. Adams was aware that Johnson's previous suicide attempt was preceded by concern over his medication. Despite her explanation that she would see him the following Monday, he continued to exhibit frustration over his inability to get help at that point. When she asked if it was an emergency, Johnson failed to respond directly and instead told her he did not want to be placed on suicide watch, as if an honest answer to Adams' question would have landed him there. Of course, this is not the only inference that could be drawn from Johnson's answer to Adams' question. But it is not an unreasonable one given his history and subsequent conduct. It will be up to a jury to decide if, despite her denial, Adams did indeed appreciate the magnitude of the risk Johnson posed to himself at the time he spoke with her.

## CONCLUSION

It is often possible, after the fact, to see the warning signs, clues, or cries for help that usually precede a suicide. Of course, prison officials cannot be held liable for failing to prevent injury or loss the danger of which only became apparent in hindsight. But in the prison context, to the extent such warning signs became manifest before a suicide, they provide a basis upon which an argument can be constructed that those in a position to take action recognized but ignored the risk of death or serious injury to another. Whether Ronald Johnson's decision to take his own life was apparent

12

before he committed suicide or became so only in hindsight is for a jury to decide. Accordingly, for the reasons set forth herein, the defendants' motion for summary judgment is denied. The Clerk is directed to set this matter on the Court's calendar for further proceedings.

**SO ORDERED** this  30th  day of December, 2008.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge